# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

       Plaintiff,

**v.**　　　　　　　　　　　　　　　　　　　　　　　**No. 18-po-2441 RB-GBW**

**PETRONA GASPAR-MIGUEL,**

       Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Petrona Gaspar-Miguel's appeal from the judgment and conviction entered by Magistrate Judge Gregory B. Wormuth on August 27, 2018. (Doc. 35.) Defendant was found guilty of illegal entry without inspection in violation of 8 U.S.C. § 1325(a). (Doc. 37 at 119.) She appeals her conviction on the ground that the Magistrate Judge incorrectly applied the law regarding the definition of "entry" and the doctrine of official restraint, and under a correct application of the law the evidence does not support a finding beyond a reasonable doubt that she entered the United States. The issue of whether continuous government surveillance constitutes official restraint in criminal immigration proceedings has not been squarely addressed by the Tenth Circuit. It has also recently become a pivotal issue in many criminal entry and reentry cases in this District.

Having reviewed the parties' arguments, the history of the doctrine, and all relevant case law, the Court finds that continuous surveillance by law enforcement during the crossing of an international border does not constitute constructive official restraint. Thus, the judgment of the United States Magistrate Judge finding Defendant guilty of entry without inspection in violation of 8 U.S.C. § 1325(a) **is affirmed**.

## I. Background[1]

### A. Facts Preceding the Charge

Defendant Petrona Gaspar-Miguel is a citizen of Guatemala. (*Id.* at 96.) On June 17, 2018, Defendant was arrested after crossing the international boundary line between the United States and Mexico. (*Id.* at 44–45.) That afternoon, Border Patrol Agent Stephen Salcido was on "line watch duty" in Sunland Park, New Mexico, monitoring the area for illegal entries. (*Id.* at 14.) At approximately 12:20 p.m., Agent Salcido was watching the border area through binoculars when he "observed some movement moving northbound from the international boundary line." (*Id.* at 15.) Agent Salcido referred to the area he was observing as "the end of the fence." (*Id.*) The fence runs along the international border in Sunland Park but ends near Mount Cristo Rey because the terrain in that area prevents the fence from continuing up the mountain. (*Id.*) Agent Salcido "observed the tail-end of some movement coming across the end of the fence." (*Id.* at 19.) He then "relayed that to [his] partners in the field and they responded and encountered some individuals." (*Id.*) When asked to clarify, Agent Salcido reiterated that he saw the movement "coming around the end of the fence there and moving in a northbound direction." (*Id.*) On direct examination, when asked if "it [would] be fair to say that [he] maintained constant surveillance on the individuals[,]" Agent Salcido responded, "yes." (*Id.* at 21.)

After Agent Salcido alerted other agents by radio that several individuals had crossed the international border, Border Patrol Agent Roberto Tellez responded to the location and apprehended three individuals, including Defendant and her son. (*Id.* at 29.) Through his binoculars, Agent Salcido observed Agent Tellez drive up to the individuals. (*Id.* at 25.) A

---

[1] The Court recites only that factual and procedural background necessary to resolve this appeal. "The record consists of the original papers and exhibits in the case; any transcript, tape, or other recording of the proceedings; and a certified copy of the docket entries." Fed. R. Crim. P. 58(g)(2)(b).

"[c]ouple of minutes" elapsed between Agent Tellez receiving the radio message and reaching the individuals who were, by that time, in the United States and approximately 50–75 yards north of the border. (*Id.* at 30.) The individuals did not run from Agent Tellez or attempt to escape. (*Id.* at 24–25.) Each of the three individuals told Agent Tellez that they were citizens of Guatemala, did not have documents to stay in the United States legally, and had just crossed the border illegally. (*Id.* at 31–32.) Border Patrol Agent Victor Ramirez then responded to the scene in a transport van and transported the individuals to the Santa Teresa Border Patrol Station. (*Id.* at 44–47.)

At the station, Agent Ramirez began processing Defendant, which included collecting and recording her biographical information. (*Id.* at 47–48.) Agent Ramirez determined that she had never been deported nor did she have any other immigration or criminal history in the United States. (*Id.* at 77–79.) The next day, Border Patrol Agent Robert De Anda finished processing Defendant at the station. (*Id.* at 60–64.) Based on their conversation, Agent De Anda "stamped 'credible fear claim' on her paperwork." (*Id.* at 80.) This indicated that, following the conclusion of any criminal proceedings against Defendant, she would be interviewed by an asylum officer regarding her claim of credible fear in Guatemala. (*Id.* at 82–83.)

Defendant testified that she feared for her life in Guatemala because she had a child with a married man and the man's wife threatened her and her son. (*Id.* at 91.) Defendant also testified that the man's wife had paid someone to sexually assault her. (*Id.*) Defendant paid an individual to guide her and her son to the U.S.-Mexico border. (*Id.* at 96.) "My goal was to enter the United States and ask for help . . . . [S]ince I didn't know where one enters, that's why I entered like that during the day, so that they could find me." (*Id.* at 92–93.) Defendant testified that she did not try to elude agents at the border: "I didn't try to hide. I crossed in broad the [sic] daylight and I did not hide and I did not run. I thought, thank God that they're here, they found me." (*Id.* at 93.)

Defendant's brother is a United States citizen who lives in Kentucky, and she stated that if she were permitted to remain in the United States she would like to live and work in Kentucky. (*Id.* at 95.)

## B. Bench Trial

Defendant was charged with improper entry without inspection, in violation of 8 U.S.C. § 1325(a), for "enter[ing] and attempt[ing] to enter the United States at a time and place other than as designated by Immigration Officers." (Doc. 1 at 1.) The Honorable Gregory B. Wormuth, United States Magistrate Judge, held a bench trial and motions hearing in the matter on August 27, 2018. (*See* Doc. 37.) After the parties elicited the facts surrounding Defendant's border crossing and subsequent apprehension as described above, Defendant moved for a directed verdict based on the official restraint doctrine. (*Id.* at 98–99.)

Defendant asserted that because the agents had kept her under constant surveillance while she crossed the border, she was under constructive official restraint the entire time and thus had not "entered" the United States. (*Id.*) "[T]he Government [] failed to prove Ms. Gaspar was guilty of entry into the United States without inspection and the proper charge was attempted entry without inspection." (Doc. 40 at 6; *see also* Doc. 37 at 98–99.) Defendant next argued that attempted improper entry is a specific intent crime, and thus the Government had not met its evidentiary burden for that charge either because the evidence showed that she had the specific intent to seek asylum, not the specific intent to enter the United States illegally and evade law enforcement.[2] (Docs. 37 at 98–99; 40 at 6.)

_____

[2] Defendant continues to advance this argument on appeal, citing testimony elicited at trial showing that she entered during the day, did not run from Border Patrol agents, and sought their assistance in entering the United States and making an asylum claim. (*See* Doc. 40 at 14–16.) However, as Defendant was convicted only of entry without inspection in violation of § 1325(a), and Judge Wormuth did not discuss the merits of her case under an attempt theory, the Court will not address the sufficiency of the evidence for an attempt conviction in this appeal. (*See* Doc. 37 at 117–19.)

The Government disputed the application of the official restraint doctrine in the Tenth Circuit and argued that the evidence proved beyond a reasonable doubt that Defendant met the three elements necessary for a conviction under 8 U.S.C. § 1325(a): (1) she was a citizen of Guatemala without authorization to enter the United States; (2) she entered or attempted to enter the United States; and (3) she entered the United States at a time or place other than as designated by immigration officers. (Doc. 37 at 111–12.) Though the Government asserted that it does not believe the official restraint doctrine applies in this District to define "entry" in criminal immigration cases, it argued in the alternative that, even if the Court accepted the official restraint doctrine and concept of surveillance as official restraint and proceeded on a theory of attempted entry, the evidence proves that Defendant had the specific intent to evade law enforcement and travel to Kentucky to reunite with her brother. (*Id.* at 100–03.)

Both parties noted that, the week before, United States Magistrate Judge Stephen R. Vidmar acquitted a defendant charged with entry without inspection on the theory that the defendant had been under Border Patrol surveillance the entire time he crossed the international border. (*Id.* at 100–01); *see also United States v. Akana-By Komlan Adjeodar*, 2:18-po-02620-CG, Tr. Bench Trial at 6:3–12:19 (Aug. 24, 2018). In that case, Judge Vidmar opined that the Tenth Circuit would likely adopt the doctrine of official restraint. *Adjeodar*, 2:18-po-02620-CG, Tr. Bench Trial at 6:3–9:20. At the close of Defendant's bench trial, however, Judge Wormuth rejected the idea of surveillance as official restraint, explaining that he was "not persuaded in any fashion that surveillance, particularly surveillance unknown to an individual, can constitute official restraint within any meaning of that word." (Doc. 37 at 117.) He held that, as a result, the undisputed evidence proved beyond a reasonable doubt that Defendant's actions met all three

required elements of the crime of entry without inspection in violation of 8 U.S.C. § 1325(a). (*Id.* at 118–19.) Defendant was convicted and sentenced to time served. (*Id.* at 120.)

## C. The Appeal

Defendant filed a timely notice of appeal on September 6, 2018. (Doc. 35 at 1.) Defendant argues that, if the official restraint doctrine is properly applied, she is not guilty of violating 8 U.S.C. § 1325(a), which makes it a crime to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers." She asserts that her appeal should be granted for two reasons:

> First, she did not "enter" the United States within the meaning of § 1325(a) because she was under official restraint from the time of her entry until her arrest. Second, she did not "attempt" to enter the United States because she did not have the specific intent to enter the United States free of official restraint.

(Doc. 40 at 10.) As previously stated, only the first theory—that Defendant did not "enter" the United States—is properly before the Court on appeal.

Defendant argues that "[f]or immigration purposes, 'entry' is a term of art requiring not only physical presence in the United States but also freedom from official restraint." (*Id.* at 10–11 (citing *United States v. Argueta-Rosales*, 819 F.3d 1149, 1158 (9th Cir. 2016)).) Citing cases from nine circuits that have defined "entry" in the immigration context, she asserts that "all the courts that have decided what conduct comprises an 'entry' have concluded that physical presence in the country is required, as well as freedom from official restraint." (*See id.* at 11 (collecting cases).) Defendant also argues that "[t]he law is well-settled that surveillance, whether known or unknown to the defendant, is sufficient to constitute official restraint that prevents an 'entry' within the meaning of the immigration laws." (*Id.* at 12.) For this proposition, Defendant cites various civil immigration decisions (*see id.* (collecting cases)), as well as *United States v. Gonzalez-Torres*, 309 F.3d 594 (9th Cir. 2002), a case affirming that in the Ninth Circuit, surveillance constitutes

constructive official restraint in criminal immigration proceedings. (*See* Doc. 40 at 12.) She then argues that, while the Tenth Circuit has not explicitly adopted the concept of surveillance as official restraint, the Tenth Circuit will likely do so based on its reasoning in the unpublished decision *United States v. Encinas-Rodriguez* and Judge Vidmar's conclusions in *United States v. Adjeodar*. (*See id.* (citing *Encinas-Rodriguez*, No. 99-2064, 1999 WL 547972, at *1 (D.N.M. July 28, 1999); *Adjeodar*, 2:18-po-02620-CG).)

The Government argues in response that the Tenth Circuit has declined to adopt the doctrine of official restraint and associated concept of surveillance as constructive official restraint, and should not do so now. (Doc. 44 at 7.) The Government makes five distinct arguments against application of the official restraint doctrine in this case. (*See id.*) First, it argues that the concept of official restraint as an element of "entry" was a civil immigration concept that should never have been applied in the criminal context. (*Id.* at 7–13.) Second, the Court should not adopt the doctrine of official restraint because "Congress expressly excised 'entry' from the [Immigration and Nationality Act] to destroy the entry fiction[.]" (*Id.* at 13–16) Third, the Ninth Circuit's continued interpretation of the official restraint doctrine in the criminal context to include continuous surveillance is radical and cuts against "Congress's express intent." (*Id.* at 16–19.)

Fourth, the Government argues that the Tenth Circuit and federal courts in the District of New Mexico have "declined to apply" the doctrine of official restraint and constructive surveillance in criminal entry and reentry cases. (*See id.* at 19–21 (citing *Encinas-Rodriguez*, 1999 WL 547972, at *1; *United States v. Franco-Lopez*, 687 F.3d 1222 (10th Cir. 2012); *United States v. Dominguez-Lopez*, No. CR 07-2438-MCA, 2008 WL 11451442, at *1 (D.N.M. May 14, 2008)).) Finally, the Government argues that adopting the doctrine of official restraint through surveillance in the criminal immigration context can and will produce absurd results, from discouraging

"vigilant border surveillance" to overburdening the Tenth Circuit with "a never-ending current of cases asking precisely which types of surveillance qualify as restraint." (*Id.* at 21–22.).

This appeal requires the Court to answer two questions: (1) does the definition of "entry" for purposes of 8 U.S.C. § 1325(a) require freedom from official restraint? and (2) if so, does continuous surveillance by law enforcement personnel constitute constructive official restraint?

## II.     Standard of Review

The Court has jurisdiction in this matter under 18 U.S.C. § 3402: "In all cases of conviction by a United States magistrate judge an appeal of right shall lie from the judgment of the magistrate judge to a judge of the district court of the district in which the offense was committed." However, "[t]he defendant is not entitled to a trial de novo by a district judge. The scope of the appeal is the same as in an appeal to the court of appeals from a judgment entered by a district judge." Fed. R. Crim. P. 58(g)(2)(D). The Court will review "the legal conclusions de novo and factual findings for clear error." *United States v. Morrison*, 415 F.3d 1180, 1184 (10th Cir. 2005). The Court must "review the record for sufficiency of the evidence . . . to determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt . . . ." *United States v. Diaz*, 679 F.3d 1183, 1187 (10th Cir. 2012) (citations omitted).

## III.    Discussion

### A. Freedom from official restraint is a required element of "entry" in the immigration context.

#### i.   The History of the Official Restraint Doctrine

The first federal appellate court to explicitly utilize "freedom from official restraint" as a term of art in an immigration matter was the Third Circuit in *United States v. Vasilatos*, 209 F.2d 195 (3d Cir. 1954). In this felony unlawful entry case (charged under the unlawful entry statute that preceded the Immigration and Nationality Act), the defendant was convicted of unlawfully

entering the United States on a ship at the Port of Philadelphia. *Id.* at 196. When the ship reached the port, the defendant, a Greek national, misrepresented to an immigration inspector that he had never been deported from the United States. *Id.* at 196–97. As a result, he was granted temporary admission "with freedom of movement in the United States." *Id.* at 197.

There was no formal definition of "entry" in the relevant statute at that time, so the court explained that when individuals present themselves at a port of entry seeking admission to the United States, they "have not been viewed by the courts as accomplishing an 'entry' by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission." *Id.* at 197. Further, the Third Circuit explained that "the view has prevailed with respect to arrivals of the type here involved that freedom from official restraint must be added to physical presence before entry is accomplished." *Id.* (citing *Lazarescu v. United States*, 199 F.2d 898, 901 (4th Cir. 1952) (a similar criminal reentry case in which the Fourth Circuit found that unlawful entry into United States territory on a ship "amounted to a violation of the act unless appellant was under restraint which prevented his departing from the vessel. When he accepted admission so that this restraint was no longer operative, the crime of entering in violation of the statute was complete").) The Third Circuit found that the defendant in *Vasilatos* had entered the United States because he had been physically present in the country while being questioned by the inspection officer, and "[t]he other essential factor, freedom from restraint, came into existence when [the officer] in Philadelphia cleared [the defendant] for a temporary stay in the United States." *Id.*

Congress enacted the Immigration and Nationality Act (INA) in 1952. Pub. L. No. 82–414, 66 Stat. 163 (June 27, 1952). The 1952 INA consolidated statutory authority covering a broad range of immigration issues, from setting quotas for new immigrants based on nationality to

regulating the use and issuance of visas and the process of naturalization. *See id.* at 163–66. Title I laid out, for the first time, a definition of "entry," stating in relevant part that "[a]s used in this act . . . [t]he term 'entry' means any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise . . . ." *Id.* at 166–67.

Title II, "Immigration," included numerous chapters governing both civil and criminal aspects of immigration law. *See id.* at 163–64. Chapter Four, "Provisions Relating to Entry and Exclusion," and Chapter Five, "Deportation; Adjustment of Status," outlined the civil process of determining whether an alien subject to removal qualified for exclusion proceedings or deportation proceedings. *See id.* at 195–219. Exclusion proceedings were reserved for "arriving alien[s]" who had not yet been allowed to enter the country. *Id.* at 200. An alien determined to be excludable was to be "immediately deported to the country whence he came, in accommodations of the same class in which he arrived." *Id.* at 201. Aliens that *had* entered the United States, on the other hand, were guaranteed more robust legal proceedings if charged with being deportable. *Id.* at 204–09. Aliens charged with being deportable were assured of notice of the charges against them, an inquiry proceeding at which they were allowed representation and the opportunity to examine evidence and cross-examine witnesses, and other due process protections. *Id.* at 209–10.

Chapter Eight, "General Penalty Provisions," laid out criminal penalties for prohibited acts including unlawful entry and reentry. *Id.* at 226–30. Section 274 made it a felony to unlawfully bring into the United States and harbor certain aliens. *Id.* at 228–29. Section 275 was the precursor to today's 8 U.S.C. § 1325(a) and stated that: "Any alien who . . . enters the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offenses, be guilty of a misdemeanor . . . ." *Id.* at 229. Section 276 made unlawful reentry without inspection a felony. *Id.* at 229–30.

Even after passage of the INA, however, courts continued to consider "freedom from official restraint" a common-law element of "entry" for immigration law purposes—despite the fact that the INA had statutorily defined "entry" broadly as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession . . . ." *See id.* at 166–67. First, in *Vitale v. Immigration & Naturalization Serv.*, 463 F.2d 579 (7th Cir. 1972), the Seventh Circuit found that an alien who arrived at a U.S. airport, was detained and had his passport confiscated, and was then released for the night but instructed to present himself the next day at an immigration office had *not* successfully entered the United States because he was under official restraint the entire time. *Id.* at 580–82. The defendant alien was thus excludable in a civil immigration proceeding because the "placing of [the defendant] in the custody of Alitalia Airlines constituted parole; he did not effect an entry into the United States." *Id.* at 582.

The next year, in *In re Pierre*, 14 I. & N. Dec. 467 (BIA 1973), the Board of Immigration Appeals held that aliens on board a ship that arrived at a port for inspection had not "entered" the United States, and in doing so articulated a narrower and more specific definition of "entry" beyond the definition in the INA:

> The courts have found it necessary to interpret the term "entry," which is now defined in section 101(a)(13) of the Act as ". . . any coming of an alien into the United States, from a foreign port or place or from an outlying possession . . . ." A survey of the many cases which have treated this subject over the years leads to the following conclusion: An "entry" involves (1) a crossing into the territorial limits of the United States, i.e. physical presence; plus (2) inspection and admission by an immigration officer; or (3) actual and intentional evasion of inspection at the nearest inspection point; coupled with (4) freedom from restraint.

*Id.* at 468 (citing *Vasilatos*, 209 F.2d 195 and *Lazarescu*, 199 F.2d 898 for the proposition that freedom from official restraint is an element of entry under the INA) (subsequent citations omitted).

In the years following *Pierre*, numerous federal courts across circuits adopted the Board of Immigration Appeals' definition of "entry" in civil immigration proceedings. *See, e.g.*, *Correa v. Thornburgh*, 901 F.2d 1166, 1172 (2d Cir. 1990) (defendant was "never free from official restraint prior to her arrest . . . and thus never entered the United States . . . . [A]t all times during [defendant's] processing, she remained in a restricted area, known as the 'Customs Enclosure', where access and egress were controlled by exit control officers"); *Yang v. Maugans*, 68 F.3d 1540, 1550 (3d Cir. 1995) (aliens that exited a wrecked ship onto a beach had not "entered" the United States because "[f]ar from indistinguishably mixing with the general population, petitioners either were apprehended shortly after coming ashore, or were brought into custody as a result of immediate and intense law enforcement efforts"); *Nyirenda v. Immigration & Naturalization Serv.*, 279 F.3d 620, 625 (8th Cir. 2002) (defendants "were sufficiently free from official restraint to effect an entry because they drove for approximately two miles into the United States after crossing").

So too did several Circuit Courts of Appeal adopt a definition of "entry" including freedom from official restraint in criminal immigration proceedings even after the INA defined "entry" broadly. *See, e.g.*, *United States v. Oscar*, 496 F.2d 492, 493–94 (9th Cir. 1974) (defendant not guilty of aiding and abetting unlawful entry because the aliens in question "did not 'enter' the United States as that term is used in § 1325" since they were being questioned and inspected by immigration officials at the port of entry throughout their attempted entry); *United States v. Kavazanjian*, 623 F.2d 730, 736–37 (1st Cir. 1980) ("'entry' is not accomplished until physical presence of an alien in this country is accompanied by freedom from official restraint[,]" so defendants were not guilty of encouraging or inducing unlawful entry in violation of § 1324 because the aliens they assisted in travelling without visas had not "entered" the United States

when they stepped off a plane in a United States airport and were paroled awaiting resolution of their asylum claims); *United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000) (district court erred in accepting defendant's guilty plea for felony reentry because actual entry "has been found by most courts to require both physical presence in the country as well as freedom from official restraint" and "the stipulated facts establish only that [defendant] approached the port of entry at the airport, and presented immigration officials with an alien registration card").

The proposition that individuals have not effectively "entered" the United States for immigration purposes if they are under the clear control of law enforcement from the moment they first set foot on American soil until their apprehension is not inherently problematic. Indeed, the Second Circuit's decision in *United States v. Macias*, 740 F.3d 96 (2d Cir. 2014), illustrates the wisdom of the official restraint doctrine when official restraint is properly defined. In that case, the defendant was convicted of being "voluntarily present and found in the United States" in violation of 8 U.S.C. § 1326 after he had been living without documentation in the United States, crossed the international border into Canada, and was then arrested by Canadian authorities and returned to the United States border in handcuffs.[3] *Id.* at 97–102. The defendant had indeed "reentered" the United States in the sense that he physically passed from the Canadian side of the border into the United States. *Id.* at 98–99. However, he was under the control of law enforcement the entire time, and thus the court held he could not be convicted of violating § 1326. *Id.* at 102.

Similarly, individuals who first physically cross into the United States at a port of entry where they are under official control, and are subsequently apprehended there, have not

---

[3] The Second Circuit analogized the "found in" provision of § 1326 to the provisions prohibiting reentry or attempted reentry: "The official restraint doctrine requires both physical presence in the country as well as freedom from official restraint before an 'attempted entry' becomes an 'actual entry[,]'" and "[t]he same principles apply to being 'found in' the United States; if an alien's presence here (after she has left the country) is so attenuated that she has not yet 'entered,' then it is insufficient to support 'found in' liability." *Macias*, 740 F.3d at 100 (citation omitted).

successfully entered the country in violation of the law because they were never truly free to leave and move throughout the country as if they had been lawfully admitted. *See, e.g.*, *Correa*, 901 F.2d at 1172; *Oscar*, 496 F.2d at 493–94; *Angeles-Mascote*, 206 F.3d at 531. By contrast, in cases where individuals physically cross the border while not restrained by law enforcement, the idea that they have successfully "entered" the United States and should be charged with immigration crimes or related civil violations makes much more sense. *See, e.g.*, *Nyirenda*, 279 F.3d at 625.

Indeed, no federal appellate court has suggested that the doctrine of official restraint, when properly defined, should be eliminated entirely from the definition of "entry." Even the Fifth Circuit, which has expressed the most concern over the doctrine, has only directly questioned its applicability in cases that require a more tenuous inferential step, like considering surveillance or parole forms of official restraint that can completely negate an individual's "entry" even after they physically crossed the border. *See United States v. Palomares-Villamar*, 417 F. App'x 437, 439 (5th Cir. 2011) ("[e]ven if we [accepted] this premise as true—that governmental surveillance is legally equivalent to official restraint—which, we do not, we would still hold that there was no plain error"); *United States v. Hanna*, 639 F.2d 194, 196 (5th Cir. 1981) ("[i]t would be a misuse of the parole concept to conclude that one who physically transports into the United States persons not otherwise entitled to come in cannot be guilty under § 1324(a)(4) if the United States grants parole to those brought in while it determines whether they should be given asylum").

When it comes to the basic idea of official restraint, however, even the Fifth Circuit's currently operative Pattern Criminal Jury Instructions note that "[a]ctual reentry requires physical presence in the United States and freedom from official restraint, while attempted reentry only requires that a previously deported alien approach a port of entry and make a false claim of citizenship or non-resident alien status." Pattern Crim. Jury Instr. 5th Cir. 2.03, Note (2015) (citing

14

*United States v. Morales-Palacios*, 369 F.3d 442, 446 (5th Cir. 2004)). The Court shares the Fifth Circuit's concern that, in many cases, the doctrine of freedom from official restraint as an element of "entry" has evolved into an anomalous and imprudent loophole in our nation's immigration laws. However, the Court finds that it is the increasingly broad definition of what constitutes official restraint, not the doctrine itself, that must be reined in.

The Tenth Circuit has also never explicitly adopted the doctrine of freedom from official restraint as an element of "entry," but has not rejected the concept either. In *United States v. Encinas-Rodriguez*, the defendant was convicted on a charge of attempted reentry after he drove to a port of entry and lied about his citizenship. 1999 WL 547972, at *1. He argued that his sentence should be reduced because he was not free from official restraint and thus could not have completed all the steps necessary to effectuate unlawful reentry. *Id.* at *1–2. The Tenth Circuit properly did not base its holding on the issue of freedom from official restraint, because such freedom is not necessary to prove attempted entry or reentry. *See id.* at *2. Instead, the court explained that "[h]ad the inspector believed [defendant's] statement of United States citizenship, he would have been admitted to the United States. [Defendant] fails to show what additional acts on his part, beyond his false assertion of United States citizenship, were necessary to complete the substantive offense of reentry." *Id.* This unpublished decision did not turn on the official restraint doctrine, but the Court agrees with Judge Vidmar's conclusion that it at least signals that the Tenth Circuit has not gone out of its way to reject the concept of official restraint entirely. *See Adjeodar*, 2:18-po-02620-CG, Tr. Bench Trial and Verdict at 6:3–7:25.

### ii. The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)

The Government's argument in this appeal rests in large part on the idea that "freedom from official restraint" was only ever meant to be considered an element of "entry" in *civil*

immigration proceedings. (*See* Doc. 44 at 7–13, 18–19.) This argument has been advanced by other opponents of the official restraint doctrine, including Judge Bybee of the Ninth Circuit in his dissent in *United States v. Argueta-Rosales*. *See* 819 F.3d at 1167 (Bybee, J., dissenting) ("it is far from clear that the concept of official restraint maps onto criminal law particularly well. Official restraint, after all, was designed to answer the question whether an alien in custody . . . was to be afforded minimal procedural rights or plenary rights"). According to the Government, then, when Congress amended the INA to remove the technical definition of "entry" and the distinction between civil exclusion and deportation proceedings, it meant to excise the elusive question of what constitutes "entry" from all immigration statutes, both civil and criminal. (*See* Doc. 44 at 13–16.)

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Pub. L. No. 104–208, 110 Stat. 3009 (September 30, 1996). The IIRIRA made various amendments to the INA, including changes aimed at ensuring that whether an alien had perfected their "entry" into the United States was no longer the pivotal factor in determining what procedural protections they would receive in civil immigration proceedings. (*See* Doc. 44 at 13–14.) In doing so, the IIRIRA replaced the term "entry" in the definitions section of the INA with the term "admitted." (*See id.* at 14.) As the Government explains:

> The IIRIRA sought, among its various aims, to terminate future litigation over entry as the lynchpin for determining the procedural due process rights of aliens. The House Judiciary Committee, in its report on the bill, explicitly stated as much, reporting that it "intended to replace certain aspects of the current 'entry doctrine,' under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." H.R. REP. 104-469, pt. 1 at 225. To that end, the committee sought to convert the "pivotal factor in determining an alien's status" to a determination of "whether or not the alien has been lawfully admitted." *Id.*

(*Id.*) The Government asserts that this legislative history demonstrates that Congress intended to eliminate the "entry fiction" in all respects. (*See id.* at 15.) However, the language it relies on actually indicates that the House Judiciary Committee sought to eliminate only "certain aspects of the current 'entry doctrine'"—the aspects in which the distinction had been used in civil proceedings "in determining an alien's status." (*See id.* (quoting H.R. REP. 104-469, pt. 1 at 225).)

The Court agrees with the Government and Congress that the manner in which the "entry doctrine" evolved had created manifest unfairness in civil removal proceedings prior to 1996. Aliens who successfully completed an unlawful entry by evading law enforcement were afforded the full panoply of procedural due process rights under the INA, while those who either failed to evade inspection or never attempted to evade law enforcement in the first place were more quickly deported without due process protections. In the criminal context, however, as the Government helpfully points out, the issue of due process protections was never the purpose of defining "entry." (*See id.* at 12 ("In criminal proceedings, that distinction is mere chimera, as aliens receive the same panoply of constitutional due process protections as any U.S. citizen.").)

Instead, the need to define the term "entry" in the criminal context arises not when determining what procedural rights to provide defendants, but in determining when and how to charge individuals accused of violating the law. In cases where an individual physically crossed onto American soil at an official port, checkpoint, or the like, but is apprehended before having the chance to continue on into the country at large, the official restraint doctrine logically dictates that they have not unlawfully "entered" the United States in violation of our nation's criminal immigration statutes but may still have attempted "entry." *See Macias*, 740 F.3d at 102 (defendant could not have "entered" while in handcuffs); *Vasilatos*, 209 F.2d at 196–97 (defendant "entered" when he was allowed to pass through the port after misleading an inspection officer about his

immigration history); *Angeles-Mascote*, 206 F.3d at 531 (defendant had not "entered" when he approached a port of entry at a United States airport, presented an alien registration card, and was subsequently arrested). Such applications of the official restraint doctrine to define "entry" in criminal cases do not affect the defendants' due process rights, nor do they make the issue of successful "entry" a "pivotal factor in determining [their] status"—the issues Congress was concerned with when amending the INA. (*See* Doc. 44 at 14.) Instead, they utilize the common-law definition of "entry" to determine what criminal immigration provisions an individual may have violated.

The Court is not persuaded that the IIRIRA sought to remove the element of "freedom from official restraint" from the longstanding definition of "entry" under the INA, for the term "entry" still appears frequently in the INA even after the IIRIRA removed it from certain sections. *See, e.g.*, 8 U.S.C. § 1101(13)(A) (the new definition of "admission" and "admitted" is: "with respect to an alien, the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer") (emphasis added); 8 U.S.C. §§ 1825, 1826. It appears that the IIRIRA aimed not to change the definition of "entry" itself, but to eliminate the need to establish "entry" at all in certain civil removability proceedings where such determinations had become problematic. The Court thus finds that, where "entry" remains a determinative element of an immigration statute, freedom from official restraint remains a required element of "entry." Where this doctrine has become problematic, however, is in the increasingly broad definition of what actually constitutes official restraint.

### B. Continuous surveillance does not constitute official restraint.

Having determined that official restraint is a required element of successful "entry" for purposes of the INA, we reach the second question presented in this appeal—whether continuous

surveillance qualifies as official restraint. The Ninth Circuit is the only circuit that has expressly applied constructive restraint through surveillance to unlawful entry and reentry cases under 8 U.S.C. §§ 1325 and 1326. *See, e.g.*, *Pacheco-Medina*, 212 F.3d 1162, 1165–66 (9th Cir. 2000) (in a § 1326 reentry case, defendant's conviction was reversed because he was under official restraint and did not successfully "enter" the United States when Border Patrol agents watched him scale the border wall and gave chase, and he "never left the agent's sight except for a split second as he rounded a corner"); *United States v. Castellanos-Garcia*, 270 F.3d 773, 775–76 (9th Cir. 2001) (upholding a § 1326 conviction when Border Patrol agents never actually saw the defendant cross the border, so he was not under official restraint and had completed his entry); *United States v. Cruz-Escoto*, 476 F.3d 1081, 1085–86 (9th Cir. 2007) (same); *Gonzalez-Torres*, 309 F.3d at 597–99 (unlawful entry and reentry convictions under §§ 1325 and 1326 reversed because Border Patrol agents had "observed [defendant] continuously" through binoculars as he crossed the border and until other agents alerted via radio reached and apprehended him).

The concept of surveillance as official restraint originated in 1908 in *Ex Parte Chow Chok* and was expressly articulated for the first time decades later by the Board of Immigration Appeals in *Pierre*. *See Ex Parte Chow Chok*, 161 F. 627, 632–33 (N.D.N.Y.), *aff'd* 163 F. 1021 (2d Cir. 1908); *Pierre*, 14 I. & N. Dec. at 468. In both these cases, a narrow definition of "entry" including freedom from official restraint served to deny procedural protections to aliens who unlawfully crossed or attempted to cross the border by dictating that they had never actually "entered" the United States. In *Chow Chok*, the court held that Chinese aliens had not entered the United States even after they crossed the international border from Canada on foot and walked a quarter mile into the United States before being apprehended, because immigration agents had been observing them the entire time. 161 F. at 628. *Pierre* did not even involve surveillance as official restraint,

as the court held there that a group of Haitian aliens had not entered the United States when they arrived by boat at a port of entry and waited to be inspected. 14 I. & N. Dec. at 468. Still, the Board of Immigration Appeals in *Pierre* cited *Chow Chok* to add an element to its definition of official restraint that would have repercussions for decades to come: "restraint may take the form of surveillance, unbeknownst to the alien." *Id.* at 469.

The Court acknowledges that, since *Pierre*, courts across circuits have indeed adopted surveillance as constructive restraint in various civil immigration contexts. *See, e.g.*, *Zhang v. Slattery*, 55 F.3d 732, 755 (2d Cir. 1995) *superseded by statute on other grounds as stated in* 618 F.3d 172, 202 (2d Cir. 2010) ("once the ship was spotted . . . the passengers aboard it were already under restraint . . . . Continuous surveillance by immigration authorities can be sufficient to place an alien under official restraint"); *Farquharson v. U.S. Attorney Gen.*, 246 F.3d 1317, 1321–22 (11th Cir. 2001) (evidence was "insufficient to indicate that [defendant] was under surveillance, and therefore under constructive restraint, when he landed his plane in Florida[,] . . . [his] landing was witnessed only by a private individual[,] . . . [and he] was not located by officials until approximately one-half hour after he landed"); *De Leon v. Holder*, 761 F.3d 336, 339–42 (4th Cir. 2014) (applicants for cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act must prove that they "entered the United States 'free from official restraint,'" which "may take the form of surveillance, unbeknownst to the alien" (quoting *Pierre*, 14 I. & N. Dec. at 469)).

Though this appeal presents only the question of whether surveillance amounts to constructive official restraint in defining "entry" under 8 U.S.C. § 1325(a), the Court is highly skeptical that surveillance should equate to official restraint at all, even in the civil contexts described above. Regardless, considering continuous surveillance to be official restraint that

prevents "entry" in the criminal context simply defies logic. In no other scenario would being surveilled continuously by law enforcement during the commission of a crime negate a defendant's actus reus in completing that crime and absolve him of liability. In *Lopez v. Sessions*, the Sixth Circuit articulated a hypothetical example demonstrating when and why law enforcement personnel might prefer to effectuate official restraint through surveillance rather than immediate physical apprehension:

> [T]here are at least two ways in which the government might restrain an individual. It could stop the individual physically at the border[,] . . . [o]r it could monitor the individual as he crosses the border by conducting surveillance of him. The government may have good reasons for allowing an alien to cross the border, only to arrest him later in time and miles from the border. The government, for example, might wish to see if the alien leads them to a safe house or joins up with other individuals who have crossed the border illegally.

851 F.3d 626, 630 (6th Cir. 2017) (citations omitted). On its face, this explanation makes sense. Law enforcement personnel must constantly make nuanced determinations about when, where, and how to apprehend individuals suspected of violating the law. What the Sixth Circuit doesn't explain in this hypothetical is why, despite the wisdom of following an individual to obtain more information before apprehending him, that individual is suddenly no longer considered to have entered the United States simply because agents watched him do so. When police set up sting operations to catch car thieves, clandestinely surveilling the "bait car" throughout the operation, an individual who successfully steals the bait car is not somehow innocent of the crime simply because law enforcement watched the entire sequence of events unfold.

The Fifth Circuit, after appearing to endorse surveillance as constructive restraint in a criminal case that did not turn on the issue, *see United States v. Villanueva*, 408 F.3d 193, 198 n.5 (5th Cir. 2005), has continued to express concern over the idea of constructive restraint in the criminal context. In *United States v. Garcia-Duarte*, 193 F. App'x 331 (5th Cir. 2006), for

example, the Fifth Circuit walked back its endorsement of the doctrine of official restraint through surveillance, noting that it "decline[s], especially on plain-error review, to accept [defendant's] assertion that the Border Patrol Agent's viewing him through an infrared unit constituted official restraint." *Id.* at 332–33. And in *United States v. Palomares-Villamar*, it stated "[e]ven if we were to accept this premise as true—that governmental surveillance is legally equivalent to official restraint—which, we do not, we would still hold that there was no plain error. There is no published Fifth Circuit authority detailing the concept of official restraint in a § 1326 case." 417 F. App'x. at 439. *See also United States v. Rojas*, 770 F.3d 366, 368 (5th Cir. 2014) (noting that the Fifth Circuit has never explicitly adopted the doctrine of official restraint).

Finally, we turn to the Tenth Circuit. Like the Fifth, the Tenth Circuit has never explicitly adopted or rejected the concept of surveillance as constructive official restraint.[4] In *United States v. Franco-Lopez*, the Tenth Circuit upheld the defendant's conviction for transporting aliens in violation of 8 U.S.C. § 1324. 687 F.3d at 1228. On appeal, the defendant argued that his conviction should be overturned because the aliens he transported had been under official restraint and thus never actually "entered" the United States. *Id.* at 1227. In upholding the conviction, the Tenth Circuit explained that the district court "noted that a 'sheer lack of evidence [did] leave a reasonable doubt as to whether the group actually 'entered' the United States such that they were free from official restraint in the form of surveillance.'" *Id.* at 1225 (quoting *United States v. Franco-Lopez,* 709 F. Supp. 2d 1152, 1165 (D.N.M. 2010)).

---

[4] The Court agrees with Defendant that *United States v. Dominguez-Lopez*, No. CR 07-2438-MCA, 2008 WL 11451442, at *1 (D.N.M. May 14, 2008) is a "lone outlier opinion" in this District. (*See* Doc. 47 at 11.) In *Dominguez-Lopez*, the court rejected the idea of certain forms of surveillance as official restraint, but created a new "totality of the circumstances test" to determine when a defendant is under official restraint. *See* 2008 WL 11451442, at *8. Courts in this District have declined to adopt the reasoning and test in *Dominguez-Lopez* in subsequent cases. As such, the Court does not believe that this district court opinion will affect the Tenth Circuit's analysis of the doctrine.

However, both the district court and the Tenth Circuit in *Franco-Lopez* went on to hold that § 1324 allows for conviction for transporting an alien who has "*has come to, entered, or remains in*" the United States, and neither having "come to" nor "remaining in" the United States require proving entry and freedom from official restraint. *Id.* at 1227. Thus, the Tenth Circuit avoided the issue because it found that proving an alien had "entered" the United States was not a required element of the charged crime. *See id.* Though the Tenth Circuit did not reject the doctrine entirely in *Franco-Lopez*, the Court finds it likely that, given the Fifth Circuit's well-articulated concerns about the concept of surveillance as official restraint and the Ninth Circuit's unique position applying the doctrine in criminal cases, the Tenth Circuit will decline to adopt the concept of surveillance as constructive restraint.

The Government's final argument against adopting the doctrine—that it will lead to absurd results—is perhaps the most compelling. (*See* Doc. 44 at 21.) The Court finds it unlikely that Border Patrol agents, having learned of the doctrine of constructive official restraint, would cease vigilantly patrolling the border simply to ensure that individuals crossing illegally could be charged with unlawful entry rather than attempted unlawful entry. However, adopting this doctrine would certainly provide agents a perverse incentive to conduct surveillance at points where the actual border itself is not visible, to allow aliens to spend more time in the United States before apprehending them, or even to be less than truthful about the extent of their surveillance efforts leading up to an apprehension.

Prosecutors too could adapt to the doctrine by simply charging individuals who remain under surveillance while crossing the border with *attempted* unlawful entry—an offense under the same statutory provision that carries the same penalty as unlawful entry. However, it seems incongruous at best to base a criminal charging decision on an in-depth analysis of the arresting

agent's actions leading up to the apprehension, rather than the actions of the potential defendant. It would also undoubtedly mean, as the Government points out, that courts in the Tenth Circuit would suddenly, and in perpetuity, be faced with an influx of cases requiring them to determine which specific factual scenarios constitute constructive official restraint. (*See* Doc. 44 at 22.)

This much is clear from the myriad Ninth Circuit decisions making hair splitting determinations about whether a unique set of facts constitutes official restraint through surveillance. *Compare, e.g.*, *Gonzalez-Torres*, 309 F.3d at 597 ("[a]lthough he lost sight of them for moments at a time, Agent Watkins observed the suspects continuously" and thus the defendant was under official restraint), *with United States v. Castro-Juarez*, 715 F. App'x 636, 637 (9th Cir. 2017) ("[a]lthough he conceded that his memory of the event was vague," the agent who first spotted the defendant on a security camera surveilling the border was "'pretty certain' that the first time he saw" the defendant he was already on the United States side of the border and was thus not under official restraint). (*See also* Doc. 44 at 22 (collecting cases illustrating the nuanced and voluminous body of case law that the Ninth Circuit has developed as result of adopting the doctrine of surveillance as official restraint—for example, a seismic sensor does not constitute official restraint while a night scope does, etc.).)

Proponents of the doctrine will argue that if an alien who is surveilled while crossing the border truly has the intent to unlawfully enter and evade law enforcement, she will be found guilty under § 1325 if properly charged with attempted entry and will then face the same consequences as if she had been convicted of entry. Only if an alien apprehended under official restraint could prove she did not commit the crime of *attempted* entry would she be acquitted. This is the crux of Defendant's argument on appeal: she did not actually enter the United States, so she should have had an opportunity to rebut the correct charge of attempted entry by proving that she had the

specific intent to seek out law enforcement and ask for asylum, not the specific intent to unlawfully enter the United States and evade law enforcement.

It is certainly possible that, had the Government charged Defendant with attempt or had the Magistrate Judge entertained those arguments, she would still have been convicted of violating § 1325. Still, as Judge Bybee laments in his analysis of the state of affairs in the Ninth Circuit, "this novel and unduly expansive definition of 'official restraint' makes no sense and creates a puzzling loophole in the law of attempted illegal []entry." *Argueta-Rosales*, 819 F.3d at 1162 (Bybee, J., dissenting). Under this doctrine, "an alien is not guilty of attempted illegal []entry even if he crosses into the United States surreptitiously and outside a port of entry, so long as he tells border control that he came in hopes of remaining under restraint by any government official." *Id.*

Here, as Agent De Anda stamped "credible fear" on Defendant's processing paperwork and acknowledged that she claimed fear of violence as her reason for leaving Guatemala, Defendant will have the opportunity to make her claim for asylum before an immigration judge in a completely separate legal proceeding from the one now before the Court. (*See* Doc. 37 at 82–83.) Whether or not she crossed the border free from official restraint will not factor into any determination of what procedural and due process protections she is afforded during this civil proceeding, nor will it affect the merits of her asylum claim. The only issue before the Court in this appeal is whether Defendant violated a *criminal* immigration law—improper entry without inspection in violation of 8 U.S.C. § 1325(a)—when, lacking valid authorization to enter or remain in the United States, she acted affirmatively and of her own free will to walk from Mexico around the "end of the fence" into the United States. Defendant's asylum claim is unrelated to the criminal charge here, and the Court declines to adopt a peculiar and logic-defying legal fiction that would blur the lines between criminal immigration charges and asylum claims. Indeed, at a time when

asylum claims at ports of entry and across the border are on the rise, conflating the distinct civil and criminal immigration proceedings laid out in the INA will only further convolute an already overburdened and underfunded immigration system.

The law is full of difficult and often imperfectly drawn lines, and there is no better example of this than the doctrine of official restraint. This doctrine carries a tortured history—having evolved haphazardly from use in civil immigration proceedings to deny aliens due process, to use in criminal immigration proceedings, and culminating in an absurdly broad definition of "official restraint" in some circuits that includes surveillance. The Ninth Circuit's application of the doctrine has led to a tortured result—case upon case requiring courts to determine just which types of sophisticated surveillance technology constitute official restraint. If Congress sees fit to clean up this issue by more fully and clearly amending the INA and the definition of "entry" in its various provisions, it can and will do so. But unless Congress prescribes otherwise, the Court will not extend this tortured result to the Tenth Circuit by adopting the position that continuous surveillance amounts to official government restraint negating "entry" in criminal immigration proceedings.

## IV.     Conclusion

For the reasons described above, the Court finds that freedom from official restraint is a required element of "entry" in the immigration context, but that continuous surveillance by law enforcement does not qualify as "official restraint" for purposes of 8 U.S.C. § 1325(a). Thus, there is sufficient evidence in the record to find beyond a reasonable doubt that Ms. Gaspar-Miguel entered the United States, and her conviction for entry without inspection in violation of 8 U.S.C. § 1325(a) is **AFFIRMED**.

_____

**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**